## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re | : | CHAPTER 7 |
| | : | |
| **PENNSYLVANIA GEAR** | : | |
| **CORPORATION,** | : | |
| Debtor | : | Bankruptcy No. 02-36436 ELF |
| | : | |
| | : | |
| **CHRISTINE C. SHUBERT,** | : | |
| Chapter 7 Trustee, | : | |
| Plaintiff | : | |
| and | : | |
| | : | |
| **HENRY STRANAHAN, STRANAHAN** | : | |
| **FAMILY BUSINESS PARTNERSHIP,** | : | |
| **L.P., H&W ASSOCIATES, and** | : | |
| **STRANAHAN CHARITABLE TRUST** | : | |
| Intervenors | : | |
| v. | : | |
| | : | |
| **ADELMAN LAVINE GOLD & LEVIN,** | : | |
| **P.C., and GARY SCHILDHORN,** | : | |
| Defendants | : | Adversary No. 04-0096 KJC |

## MEMORANDUM[1]

**BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE[2]**

### BACKGROUND

On November 18, 2002, Pennsylvania Gear Corporation (the "Debtor" or "Penn Gear")

filed a chapter 11 bankruptcy petition. On December 30, 2002, the Debtor's chapter 11 petition

---

[1]This Memorandum constitutes the findings of fact and conclusion of law, as required by Fed.R.Bankr.P. 7052. This Court has related-to jurisdiction over this matter pursuant to 28 U.S.C. §1334 and §157(a). Because all parties have consented, I may enter a final order pursuant to 28 U.S.C. §157(c)(2). (Tr. 7/8/05 at 140.)

[2]On December 9, 2005, I assumed office as a bankruptcy judge in the District of Delaware. On the same date, I was designated by the Third Circuit Court of Appeals to sit as a bankruptcy judge in the Eastern District of Pennsylvania for the purpose of completing various matters, including this one.

was converted to a case under chapter 7 of the United States Bankruptcy Code. Christine Shubert (the "Trustee") was appointed as the chapter 7 trustee for the Debtor's estate.

On January 28, 2004, this adversary proceeding was commenced when the Trustee filed a complaint against defendants. Adelman Lavine Gold & Levin ("Adelman"), Gary M. Schildhorn, Esquire ("Schildhorn") and Robert J. Lenahan, Esquire ("Lenahan")(collectively, the "Defendants"). The Complaint sought relief from the Defendants for professional negligence, breach of contract and breach of fiduciary duty. The Complaint was amended and currently before this Court is the Trustee's Second Amended Complaint (docket no. 198) filed on March 21, 2005. The Defendants filed an answer to the Second Amended Complaint on March 30, 2005. The Second Amended Complaint dropped the breach of fiduciary duty claim, but included an alternative "claim" for "liquidation value damages" resulting from the Defendants' negligence and/or breach of contract.

By order dated September 29, 2004, the Court granted the petition to intervene filed by Henry Stranahan, individually, Stranahan Charitable Trust, Stranahan Family Business, L.P., and H&W Associates (jointly, the "Intervenors"). The September 29, 2004 Order granted the Intervenors plaintiff status in the adversary proceeding and permitted the filing of the Intervenors' Amended Complaint.[3] The Trustee filed an answer to the Intervenors' Amended Complaint on November 10, 2004 and Adelman filed an answer on November 19, 2004. The Intervenors seek relief under five counts for damages suffered by each Intervenor due to the Defendants' alleged professional negligence.

---

[3]The Intervenors' Amended Complaint (docket no. 89) was filed on September 14, 2004 along with the Motion to Intervene.

On May 4, 2005, the parties filed a Joint Pre-trial Statement (the "JPS"). Trial also began

on that date and was held on more than twelve separate days, ending on August 31, 2005.[4]

Thereafter, each of the parties separately filed proposed findings of fact and conclusions of law,

as well as responses thereto.

For the reasons set forth herein, I conclude that judgment should be entered in favor of

the Defendants and against the Trustee and Intervenors.

## FACTS

The Debtor, Penn Gear, was a Pennsylvania corporation in the business of manufacturing

industrial gear products. (JPS, ¶1,2.) On or about December 21, 2001, the Debtor entered into a

lending relationship with Fleet National Bank ("Fleet"), pursuant to which Fleet agreed to extend

to the Debtor various credit facilities, including a $1,200,000 line of credit, $100,000 standby

letters of credit, and a $4,627,500 term loan to the Debtor (the "Fleet Indebtedness"). (Ex. P-50.)

As part of the loan transaction, the Debtor executed a Security Agreement in which the Debtor

granted Fleet a security interest in the "Collateral," which included virtually all of the Debtor's

assets.[5] (Ex. P-51.) No personal guarantees were given in connection with the Fleet

Indebtedness. At the time of the loan transaction, Fleet failed to perfect its security interest in

the Collateral. As will be explained below, this failure is the genesis of the dispute now before

---

[4]After the Trustee and Intervenors completed their case in chief, the Defendants filed a motion for judgment on partial findings under Fed.R.Bank.P. 7052(c)(the "Rule 52(c) Motion") (docket no. 250). On July 8, 2005, a hearing was held to consider the Rule 52(c) Motion. By Order dated July 12, 2005, the Rule 52(c) Motion was granted in part, and Lenahan was dismissed as a defendant. Resolution of the Defendants' request for dismissal of the Intervenors' claims was reserved until completion of the trial. (See docket no. 258). By rendering a final decision on the Trustee's and Intervenors' Complaints in this Memorandum, the Rule 52(c) Motion has become moot.

[5]The definition of Collateral in the Security Agreement included, among other things, accounts, inventory, instruments, goods, equipment, fixtures, and general intangibles. (Ex. P-51.)

the Court.

On or about July 3, 2002, Fleet sent the Debtor a letter describing the Debtor's non-compliance of certain covenants contained in the loan agreement and declaring an event of default.[6] (Ex. P-69.)  Henry Stranahan, on behalf of the Debtor, contacted Schildhorn and advised that the company was seeking representation in connection with a troubled lending relationship. (Tr. 8/11/05 at 26).  Schildhorn told Henry Stranahan that he would charge a retainer of approximately $20,000 to $25,000 to represent the company in such a matter. (*Id.*) A day or two later, Henry Stranahan called Schildhorn again and asked for a preliminary meeting at which Schildhorn would answer questions about the Debtor's dealings with Fleet. (Tr. 8/11/05 at 28).  *Henry Stranahan told Schildhorn that he had over 30 years' experience in dealing with banks to obtain financing for his companies and, further, that he was familiar with bankruptcy concepts, since one of his companies had been involved in a chapter 11 bankruptcy case in which the court had confirmed a chapter 11 plan.* (Tr. 8/11/05 at 27.)

On July 8, 2002, Craig Stranahan, the President of Penn Gear, sent a fax to Schildhorn confirming the meeting and sending copies of the Fleet default letters and the Debtor's calculations disputing the analysis in Fleet's letters. (Tr. 8/11/05 at 29; Ex. D-82.)

On July 10, 2002, Schildhorn met for about two hours with four members of the Stranahan family - - Henry, Craig, Kyle, and Todd (sometimes together referred to herein as the "Stranahans"). (Tr. 5/13/05 at 26; Tr. 8/11/05 at 31.)  Henry Stranahan gave Schildhorn a memo outlining some of the issues with Fleet. (Tr. 5/13/05 at 33-34; Ex. P-80).  At the meeting, the

---

[6]The Fleet letter stated that the Debtor was not in compliance with the agreed Fixed Charge Coverage Ratio of not less than 1.10 to 1 and the agreed Current Ratio of not less than 1.0 to 1.

parties discussed a potential lender liability suit against Fleet and the possibility of negotiating a

reduced payoff. (Tr. 8/11/05 at 32-28.) At the end of the July 10, 2002 meeting, Schildhorn

suggested that the Debtor hire his law firm, Adelman, to represent the Debtor in connection with

the Fleet Indebtedness. (Tr. 8/11/05 at 38.) Schildhorn provided them with a retention letter

agreement that had been prepared before the meeting. (Id.; Ex. P-81.)[7] The Stranahans took the

letter and said they would get back to Schildhorn.[8] (Tr. 8/11/05 at 38.) It is undisputed that

Schildhorn did not investigate whether Fleet had properly perfected its security interest in the

Collateral. (JPS, ¶14)  Neither is it disputed that Schildhorn never advised Penn Gear or the

Intervenors of the possible consequences of failing to undertake such a search.

On July 12, 2002, the Debtor sent a letter to Fleet stating that it disagreed with Fleet's

analysis and determination that the Debtor failed to comply with the covenants in the loan

documents. (Ex. D-88.) Schildhorn was not copied on the Debtor's letter. (Tr. 5/13/05 at 47.)

On August 6, 2002, Fleet sent another letter to the Debtor, asserting payment defaults.

(Ex. P-71.) The next day, Craig Stranahan contacted Schildhorn by fax letter, stating that the

Debtor wished to retain Adelman and requesting a meeting. (Ex. D-98.) The fax enclosed the

retention letter agreement now signed by Craig Stranahan, as president of Penn Gear. (Id.) The

retention letter stated that Adelman would "represent the Company with respect to the

---

[7]The retention letter given to the Stranahans on July 10, 2001 was not (yet) signed by Craig
Stranahan. Exhibit P-81 is the copy executed on behalf of both parties. (Tr. 8/11/05 at 43.)

[8]By letter to the Debtor dated July 10, 2002 (apparently sent after the July 10, 2002 meeting at
Adelman), Henry Stranahan, on behalf of H&W Associates, demanded payment of the rent arrearage
allegedly owed by the Debtor to H&W, the Debtor's landlord. (Ex. D-83.) This letter was offered by
H&W to demonstrate that, in fact, Adelman undertook a representation of H&W on July 10, 2002 and
was sent on Schildhorn's advice. Schildhorn vigorously disputes this.

indebtedness owed to Fleet Bank." Craig Stranahan also faxed Schildhorn a copy of the August

6, 2002 default letter from Fleet. (Id.)

In August, Fleet discovered that it had not filed UCC-1 financing statements to perfect its

security interest in the Collateral and instructed counsel immediately to file the necessary

financing statements. (Ex. P-180 at 27.)[9]  On August 8, 2002, Fleet filed a UCC-1 financing

statement covering the Collateral. (JPS, ¶15.) Also on August 8, 2002, Schildhorn met briefly

with counsel for Fleet Bank, Morton R. Branzburg, Esquire ("Branzburg"). (JPS, ¶14; Tr.

8/11/05 at 46-48).

On or about August 9, 2002, Schildhorn had a second meeting with the Stranahans at

which Schildhorn described the chapter 11 process to them and the possibility of negotiating a

"work-out" with Fleet. (Tr. 8/11/05 at 48-52.) At that meeting, the parties also discussed that

Fleet's Collateral was kept on the Debtor's leased premises, which was owned by H&W

Associates, an entity controlled by Henry Stranahan. (Tr. 8/11/05 at 53).

After the August 9, 2002 meeting, Schildhorn received a package from the Debtor

containing the Fleet loan documentation and correspondence. (Tr. 8/11/05 at 54.) Thereafter, on

August 13, 2002, Schildhorn received a fax from Craig Stranahan stating "Please take no action

on the Fleet Bank matter at this time. We will advise further on August 23rd." (Ex. D-103.)

According to Henry Stranahan, the Debtor intended to have a "business-to-business" meeting

with Fleet - - without lawyers present - - to develop the outline of a work-out agreement that

---

[9]Exhibit P-180 is the transcript of the videotaped deposition of Alisa Callahan, a vice president in
Fleet's Managed Assets Division, who was responsible for the Penn Gear loan between July 2002
through May 2004. (Ex. P-180 at 6-9.) Callahan's videotaped deposition was played for the Court
during the trial. The transcript is also admitted into evidence.

could then be finalized by the lawyers. (Tr. 6/2/05 at 47.)  On August 21, 2002, the Stranahans

met with Fleet in Providence, Rhode Island. (Ex. P-180 at 26.)  Although the Debtor did not

have an attorney present, Fleet's counsel, Branzburg, attended the meeting.[10]  (Tr. 6/2/05 at 52.)

At the August 21, 2002 meeting, the Debtor offered to make nominal payments on the

Fleet Indebtedness until the Debtor could "buy-out" the loan at a discount. (Ex. P-180 at 33-35.)

Fleet viewed the offer as unreasonable, especially due to the Debtor's refusal to allow Fleet

access to accurate financial information and denial of the Bank's request for a field

examination.[11]  (Id.)

On August 23, 2002, Branzburg sent a letter to the Debtor stating that no agreement had

been reached at the August 21, 2002 meeting. (Ex. D-108.)  Despite receipt of Branzburg's

letter, the Stranahans claimed that an agreement had been reached with Fleet and sent a fax to

Alisa Callahan on August 26, 2002, stating that the Debtor was moving forward according to the

"working agreement." (Ex. D-109; Tr. 6/2/05 at 61-62.)  At the direction of Alisa Callahan,

Branzburg responded by sending a second letter to the Debtor stating that the Debtor's proposed

"working agreement" was unacceptable to Fleet.  (Ex. D-110; Ex. P-180 at 163.)

In the meantime, Craig Stranahan contacted Schildhorn on August 23, 2002 to request

another meeting. (Ex. D-107.)  On August 29, 2002, Schildhorn had a third meeting with the

---

[10]Although the Stranahans insisted that they wanted to meet without attorneys, Fleet told the
Stranahans prior to the meeting that it intended to have counsel present and "strongly encouraged" the
Debtor to do the same. (Ex. P-180 at 38.)

[11]Fleet also considered the Debtor's offer unreasonable because the Debtor would not agree to
hire a turn-around consultant and did not offer to make interest payments at the default rate or to make
any principal payments.  The offer was to make only interest payments at the non-default rate for an
indefinite period of time. (Ex. P-180 at 34.)  No "buy-out" number was discussed at the meeting, but
thereafter, the Debtor prepared a financial package which placed the liquidation value of the Collateral at
less than $1 million. (Id. at 35.)

Stranahans.  At the meeting, the Stranahans told Schildhorn that Penn Gear was unable to make

a deal with Fleet. (Tr. 8/11/05 at 60.)  Henry Stranahan showed Schildhorn a written proposal he

had prepared, in which Fleet would foreclose and sell the assets to a new company. (Ex. D-114.)

Fleet would get no money, but would hold a two million dollar note secured by the equipment

and would receive over three million dollars of preferred stock in the new company. (Ex. D-114,

Tr. 8/11/05 at 60-61.)  Schildhorn explained why he thought the proposal "didn't stand a chance

at all" and discussed how a new company could buy assets as long as it paid fair value, based

upon independent valuations. (Tr. 8/11/05 at 61.)  Schildhorn also discussed the fiduciary duties

of the officers and directors of an insolvent company. (Tr. 8/11/05 at 61, 64-65.)  At the

conclusion of the meeting, the Stranahans indicated they would continue their search for

financing.[12] (Tr. 8/11/05 at 68.)

  While Penn Gear was trying to negotiate a workout with Fleet in August 2002, the

Stranahans also had other attorneys representing the Intervenors on related matters.  On August

15, 2002, John P. Koopman ("Koopman"), counsel for H&W Associates, sent a letter to the

Debtor advising that the Debtor was in default of its rent payments under the lease agreement and

electing to terminate the lease. (Ex. D-104.)  In September, Koopman prepared a security

agreement between the Debtor and H&W Associates in which the Debtor granted H&W

Associates a security interest in its accounts receivable and other assets. (Tr. 6/2/05 at 88-91; Ex.

---

[12]The parties had differing views about Schildhorn's role after the conclusion of the August 29,
2002 meeting.  Schildhorn understood that he was to take no action while they continued to look for
financing. (Tr. 8/11/05 at 68.)  The Stranahans assert that Schildhorn was going to start negotiating
the terms of a forbearance agreement with Branzburg while they sought financing. (Tr. 5/13/05 at 93-94.)
My evaluation of the evidence and credibility of the witnesses leads me to conclude that the Stranahans
again instructed Schildhorn not to take any action after the August 29, 2002 meeting until he heard from
them about financing.

D-140.) On or about September 30, 2002, at the direction of Henry Stranahan, Koopman also

prepared and filed UCC-1 financing statements for H&W Associates regarding its security

interest in the Debtor's accounts receivable and other assets. (Tr. 6/2/05 at 89-92, Ex. D-141 and

Ex. D-142.)

On August 27, 2002, Henry Stranahan sent a letter to Maury Reiter ("Reiter"), counsel for

the Stranahan Charitable Trust, advising that the Debtor owed $250,000 to the Stranahan

Charitable Trust based upon a promissory note dated September 19, 2001 (the "SCT Note"), and

asking that Reiter file UCC-1 financing statements to secure the debt. (Tr. 6/02/05 at 63-64; Ex.

D-111 and Ex. D-1112.) On September 3, 2002, Henry Stranahan, on behalf of the Stranahan

Charitable Trust, sent a letter to the Debtor demanding payment in full of the SCT Note. (Ex. D-

116). By letter dated September 10, 2002, Reiter sent Henry Stranahan a Forbearance Agreement

and a Security Agreement between the Debtor and the Stranahan Charitable Trust. (Ex. D-122,

Ex. D-124, and Ex. D-125.) On September 20, 2002, at the direction of Henry Stranahan,  Reiter

filed UCC-1 financing statements for the Stranahan Charitable Trust. (Ex. D-111 and D-132; Tr.

6/2/05 at 63.)

On September 3, 2002, the Debtor informed Schildhorn by fax that it would be receiving

a financing commitment on September 16, 2002. (Ex. D-115; Tr. 8/11/05 at 69.) On September

4, 2002, Schildhorn faxed the Debtor asking for direction about what to do with the information,

writing, "What do you want me to do with this?" (Ex. D-117, Tr. 8/11/05 at 69.) Thereafter, the

Debtor requested another meeting and one was scheduled for September 26, 2002. (Ex. D-134;

Ex. D-135.) Prior to the meeting, Schildhorn received copies of two letters from the Debtor to

Fleet enclosing an "updated financial report" and advising that the Debtor could resume interest

payments beginning in October until "an appropriate agreement" was reached. (Ex. D-127, Ex.
D-128.) Schildhorn also received a copy of the financial report that was enclosed with the
letters. (Ex. D-126.) The Debtor cancelled the meeting scheduled for September 26, 2002
because it was unable to get financing in place. (Tr. 8/11/05 at 73.)

The next contact between the Debtor and Schildhorn was an unplanned meeting in early
November 2002, when the Stranahans "dropped by" Schildhorn's office. (Tr. 8/11/05 at 74.)
The Stranahans stated that they were not any closer to resolving issues with Fleet. (*Id.*)
Schildhorn then introduced the Stranahans to Robert Lenahan, since Schildhorn was going out of
town. (*Id.*)

On November 13, 2002, Fleet instituted a civil action against the Debtor in the Bucks
County Court of Common Pleas to recover the amounts owed to it by the Debtor, which included
issuance of a Writ of Seizure against the Collateral. (JPS, ¶24.) Schildhorn, while out of town,
had a telephone conversation with the Stranahans about filing a chapter 11 bankruptcy petition.
(Tr. 8/11/05 at 75). Schildhorn advised that he would require a retainer of $100,000 to do so.
(*Id.*) There was no further communication between the Debtor and Schildhorn. (Tr. 8/11/05 at
76.)

On November 18, 2002, the Debtor filed a chapter 11 bankruptcy petition with other
counsel. The Debtor's Schedules reflect that, at the time of the filing, Fleet was owed
approximately $5.8 million. (Ex. P-150.) On December 5, 2002, Fleet filed a motion to convert
the Debtor's bankruptcy case to chapter 7 (the "Motion to Convert").[13] (JPS, ¶33.) On

---

[13]Although the uncontested facts in the JPS provide that Fleet's motion to convert was filed on
December 4, 2002, the court's docket shows that it was filed on December 5, 2002. (Docket no. 02-
36436, item no.18.)

Jun. 26. 2006 2:58PM           No. 7999   P. 12/32
Case 04-00096-kjc   Doc 300   Filed 06/26/06   Entered 06/26/06 16:29:13   Desc Main
Document     Page 11 of 31

December 6, 2002, the Debtor filed a motion to dismiss its voluntary chapter 11 petition (the "Motion to Dismiss"). (JPS, ¶34.) On December 11, 2002, the Bankruptcy Court heard testimony and argument on Fleet's Motion to Convert and the Debtor's Motion to Dismiss. (JPS, ¶35.) At the conclusion of the hearing, a bench order was entered directing the Debtor to do the following on or before December 16, 2002: (i) file all schedules, statement of affairs and related papers; and (ii) indicate whether it would consent to appointment of a chapter 11 trustee. (Bky. No. 02-36436, docket no.35.)

Upon the Debtor's refusal to agree to the appointment of a chapter 11 trustee, the Court converted Penn Gear's chapter 11 bankruptcy case to a chapter 7 liquidation case on December 30, 2002, and Christine Shubert was appointed as the chapter 7 trustee. (JPS, ¶27.) On April 28, 2003, an Order was entered granting the United States Government relief from the automatic stay to initiate a proceeding to terminate certain military contracts.[14] (JPS, ¶32, Docket no. 02-36436, item no. 246) On the same date, the Court entered an order authorizing a public auction of the Debtor's assets. (Docket no. 02-36436, item no. 239.)

On June 3, 2003, the Debtor's machinery and equipment were sold in an auction sale for a total amount of $805,454.93. (JPS, ¶28.) Fleet received approximately $700,525.14 from the

---

[14]In the course of its operations in 2002, Penn Gear was awarded contracts to manufacture parts for the United States Army Tank Automotive Armaments Command ("TACOM"), including the following: (i) an order to manufacture transmission assemblies dated May 17, 2002, (ii) an order to manufacture tank final drives dated July 16, 2002, (iii) an order to manufacture tank drive unit angles dated September 19, 2002), (iv) an order to manufacture tank clutch assemblies dated September 19, 2002, and (v) an order to manufacture tank spur gear drive assemblies dated November 19, 2002). (JPS, ¶¶18, 19, 20, 21, 22 and 23.)

11

auction proceeds.[15] (JPS, ¶20.) As part of the chapter 7 liquidation, the amount of $175,000 was

recovered on collection of the Debtor's outstanding accounts receivable.[16] (JPS, ¶31.) Fleet

asserted a first lien on the receivables. (*Id.*)

On August 19, 2003, the Trustee filed several adversary complaints against Henry

Stranahan, William Stranahan, the Stranahan Family Business Partnership, L.P., Pennsylvania

Manufacturing Technologies, Inc., and others seeking, among other things, to avoid allegedly

fraudulent transfers (the "Insider Adversary Proceedings").[17] (JPS, ¶¶39-42.) On January 28,

2004, the Trustee filed the complaint commencing this adversary proceeding. On October 6,

2004, an Order was entered in each of the Insider Adversary Proceedings which suspended

further activity in each proceeding pending resolution of this adversary proceeding.[18]

## DISCUSSION

I.   Professional Negligence.

Count I of the Trustee's Complaint and all counts in the Intervenors' complaint seek to

recover damages against Adelman and Schildhorn under a theory of professional negligence. To

recover on a claim of legal malpractice, a plaintiff must prove three elements: (1) the

---

[15]Fleet received the auction proceeds net of the auctioneer's commission of $51,256.23, the auctioneer's expenses of $31,706.60, and the Trustee's fee of $21,966.96. (JPS, ¶29.)

[16]As of November 15, 2002, the Debtor reported accounts receivable in the amount of $301,436.00. (JPS, ¶30.)

[17]The Trustee's complaints were filed at adversary numbers 03-937, 03-939, 03-940, 03-941 and 03-942.

[18]I may take judicial notice of the dockets and orders in those adversaries pursuant to Fed.R.Evd. 201, made applicable to this proceeding pursuant to Fed.R.Bankr.P. 9017. ("Federal Rule of Evidence 201 authorizes a court to take judicial notice of an adjudicative fact 'not subject to reasonable dispute'...[and] so long as it is not unfair to a party to do so and does not undermine the trial court's fact finding authority." *In re Indian Palms Assoc.*, 61 F.3d 197, 205 (3d Cir. 1995)).

employment of the attorney or other basis for duty; (2) the failure of the attorney to exercise

ordinary skill and knowledge; and (3) that such negligence was the proximate cause of damage to

the plaintiff. *Rizzo v. Haines*, 520 Pa. 484, 499, 555 A.2d 58, 65 (Pa. 1989); *Fiorentino v.*

*Rapaport*, 693 A.2d 208, 212 (Pa. Super 1997).    These elements must be proven by a

preponderance of the evidence. *Fiorentino*, 693 A.2d 212.

    (A)    Employment/Duty - Debtor and Defendants.

    The evidence demonstrates that the Debtor employed the Defendants on or about August

6, 2002, when the Debtor returned the retention letter, executed on behalf of the Debtor by Craig

Stranahan, and paid the $5,000 retainer.[19]   The retention letter stated that Adelman was

representing the Debtor "with respect to the indebtedness owed to Fleet Bank" and limited the

representation by stating that litigation or a chapter 11 bankruptcy filing would require a separate

retainer. (Ex. D-98.) The Defendants argue, however, that the Debtor *further* limited the scope

of employment, because Henry Stranahan claimed to have experience in financing the company's

operations and wanted Schildhorn on retainer only to "answer questions," but not take any action

with respect to Fleet without specific instructions from the Debtor. The Debtor asked that the

---

[19]Although there is some decisional law which stands for the proposition that an attorney/client relationship may arise as a result of a preliminary consultation with an attorney (*see, e.g., Bays v. Theran*, 639 N.E.2d 720, 723-24 (Mass. 1994)), the facts here do not support the existence of an employment relationship and a duty by the Defendants to commence work on behalf of the Debtor prior to signing the retention letter on or about August 6, 2002. *See  McGlynn v. Gurda*, 585 N.Y.S.2d 608 (N.Y. App. Div. 1992)(Dismissing a complaint for legal malpractice based on a missed statute of limitations because, although the plaintiff contacted the attorneys regarding a malpractice claim, there was never any agreement to undertake representation of the plaintiff.) Here, the July 8, 2002 fax from Craig Stranahan confirming the July meeting specifically stated that it was a consultation to take place "[b]efore we proceed with an engagement with your firm....." (Ex. D-82.) At the conclusion of the July 10, 2002 meeting, Schildhorn recommended that the Debtor employ his firm, but the Debtor requested more time to decide.  August 6, 2002 is the earliest date on which representation in this case could have commenced.

employment proceed with a smaller retainer. There were also direct requests from the Debtor to
limit the Defendants' work. After signing the retention letter, Craig Stranahan sent Schildhorn a
fax instructing him not to perform any services until he heard from the Debtor after the
"business" meeting with Fleet. (*See* Ex. D-103.) Moreover, after the August 29, 2002 meeting,
the Stranahans again instructed Schildhorn not to proceed until they advised him of the status of
their attempt to obtain financing.

"Whether a legal duty exists under a particular set of facts is usually a question of law for
the court to decide." *Jones v. Bresset*, 47 Pa. D. & C. 4th 60, 70, 2000 WL 33116007
(Lackawanna County, 2000) *citing Althaus by Althaus v. Cohen*, 710 A.2d 1147, 1152
(Pa.Super. 1998). However, "the primary issue in a legal malpractice suit is not the existence of
a duty but the extent of that duty," and "[t]he extent of the duty derives from the circumstances,
being the subject matter of the retention and the parties' agreement." *Jones*, 47 Pa. D. & C. 4th at
70 *quoting* Mallen, R.E. Smith, *Legal Malpractice*, §8.2, p. 558 (4th ed. West Publishing 1996).

In *Jones*, the court dismissed a legal malpractice case after determining that the attorney
adequately advised the client in writing at the inception of the relationship that his representation
was solely for the purpose of securing an accounting in a bankruptcy proceeding, and would not
include  evaluation of a potential malpractice claim against prior counsel. The *Jones* Court cited
to Rule 1.2(c) of the Pennsylvania Rules of Professional Conduct, which provides that "[a]
lawyer may limit the scope of the representation if the limitation is reasonable under the
circumstances and the client gives informed consent."  42 Pa.C.S.A., Rules of Prof. Conduct,
Rule 1.2. The *Jones* Court held that the "unique circumstances" surrounding the attorney's
retention in that case, as reflected in the "uncontroverted letters" delivered to the client clearly

14

showed that the attorney had no legal duty with regard to evaluating a malpractice case.[20] *Jones*,

47 D.&C.4[th] at 73.

The Trustee argues that the Debtor's employment of the Defendants through November

14, 2002 created an unrestricted attorney/client relationship which gave rise to, among other

things, a duty to investigate Fleet's secured status. The record in this case, however,

demonstrates that the Stranahans - - who were sensitive to legal costs and suspicious of attorney

involvement in what they deemed to be "business strategies" - - constantly limited Schildhorn's

(and Adelman's) representation. However, I need not decide (i) whether it was reasonable to

limit the Defendants' representation to the extent that it would relieve them from conducting a

search of Fleet's secured status (or explaining the consequences of a failure to perform such a

search) or (ii) whether the Stranahans' gave "informed" consent to such a limitation. Instead, for

the reasons given below, even assuming (without deciding) that the Defendants owed such a duty

to the Debtor and breached that duty, the record in this case does not support the conclusion that

such a breach was the *cause* of any damage sustained by the Debtor.

---

[20]The *Jones* Court emphasized that its holding was limited to the peculiar facts of that case and "should not be misconstrued as granting license to successor attorneys to turn a blind eye to any apparent malpractice or misconduct by prior counsel." *Jones*, 47 Pa.D.&C. 4th at 74.

The Rules of Professional Conduct do not provide a basis for determining that a duty existed or was breached. The Preamble to the Rules, in a note entitled "Scope," provides in pertinent part:

   Violation of a Rule should not itself give rise to a cause of action against a lawyer nor should it create any presumption in such a case that a legal duty has been breached. In addition, violation of a rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation. The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.

42 Pa.C.S.A., Rules of Professional Conduct, Preamble and Scope (2006). *See also Maritrans GP, Inc. v. Pepper Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1279 (Pa. 1992)("[V]iolations of the Code [of Professional Responsibility] do not *per se* give rise to legal actions that may be brought by clients or other private parties....")

(B)    Employment - Intervenors and Defendants.

To establish their negligence claims, the Intervenors likewise must prove that the Defendants were employed to represent their interests or provide some other basis for finding that the Defendants owed a duty to them. The Intervenors argue that there was either an express or implied attorney/client relationship with the Defendants. With the possible limited exception of H&W Associates, the record in this case establishes neither.

The retention letter is addressed only to Penn Gear and clearly provides that the "Company" - - Pennsylvania Gear Corporation - - is the client whom the Defendants will represent. The retention letter is neither directed to nor signed by the Intervenors. It is signed on behalf of Penn Gear, only, by Craig Stranahan as its president. All correspondence to Schildhorn was sent on Penn Gear letterhead, signed by its president, Craig Stranahan. Schildhorn testified that there was no mention of the Intervenors, except H&W Associates' landlord status, at any of the meetings.[21] There is no basis for finding an express attorney/client relationship here.

In the absence of an express agreement, Pennsylvania courts have recognized an implied attorney/client relationship if the following elements are shown: (1) the purported client sought advice or assistance from the attorney; (2) the advice sought was within the attorney's professional competence; (3) the attorney expressly or impliedly agreed to render such assistance; and (4) it was reasonable for the putative client to believe the attorney was representing him.

---

[21]There is sharply divided testimony on this issue. Based upon the opportunity to observe the witnesses and evaluate their testimony, I conclude that Schildhorn's testimony provides the most accurate description of these meetings. Henry Stranahan's testimony was, at times, inconsistent and, therefore, unreliable.

*Capital Care Corp. v. Hunt*, 847 A.2d 75, 83 (Pa.Super. 2004); *Cost v. Cost*, 677 A.2d 1250,

1254 (Pa. Super. 1996).

The Intervenors have not provided sufficient evidence that the Intervenors sought advice

from Schildhorn or that Schildhorn expressly or impliedly agreed to advise the Intervenors on

any matters.[22]  Schildhorn testified that there was no discussion or advice given with respect to

the Intervenors during the meetings.  (Tr. 8/11/05 at 30, 39, 52, 67, and 180-81.)  The Intervenors

assert that other entities were discussed in the context of the potential lender liability suit.

However, mention of the existence of the Intervenors at some point in a meeting, without more,

does not provide reliable evidence that the Intervenors requested advice from Schildhorn or that

he offered advice to them.[23]

---

[22]The only possible exception to this statement is H&W Associates. Both parties agree that there
was some discussion about the fact that H&W Associates was the landlord of the property at which the
Debtor operated and kept Fleet's collateral. Schildhorn, however, testified that the subject was discussed
in the context of whether the Debtor would gain some leverage by telling Fleet that it would not be able
to liquidate its collateral "in place" because the collateral was being moved "in[to] the street." (Tr.
8/11/05 at 211-12, 215.) There was no discussion about H&W Associates sending a default letter to the
Debtor. (Tr. 8/11/05 at 215-16.) The record does not contain sufficient evidence to meet the
requirements of implied attorney client relationship between the Defendants and H&W Associates.
Furthermore, the evidence showed that another attorney, Koopman, was representing H&W Associates'
interests during the period in question. However, even assuming that H&W could reasonably believe
that the Defendants were rendering legal advice to it for the limited purpose of sending a default letter to
the Debtor, I conclude that no harm resulted from that limited representation and that no damage was
caused by this advice.

[23]While I conclude that no duty to the Intervenors arose under the circumstances, it should be
noted that family-owned businesses often involve multiple family entities with possibly divergent and
conflicting interests. It ought to be incumbent upon experienced counsel, even in a situation involving a
limited representation, to ask about whether such relationships exist and to advise the client that the
client may have interests adverse to other family members or entities. Here, I am convinced that the
Stranahans intentionally limited and filtered information about their business (and family) relationships
to Schildhorn. Moreover, I am convinced that Penn Gear was likely in the "zone of insolvency" at the
time it first approached Schildhorn, which would have prevented Schildhorn and Adelman from
representing the Intervenors in connection with the indebtedness owed to Fleet, due their conflicting
interests and to the fiduciary duty to creditors which arises under such circumstances. *Voest-Alpine
Trading USA v. Vantage Steel Corp.*, 919 F.2d 206, 217 n.25 (3d Cir. 1990); *Miller v. Dutil (In re Total*

17

Instead, this record reveals that the Intervenors sought representation from other counsel with respect to their interests against the Debtor during the period of time in question. More specifically, Schildhorn testified that Henry Stranahan remarked that the Debtor could not employ counsel from Henry Stranahan's previous chapter 11 experience because that counsel now represented him personally. (Tr. 8/11/05 at 27-28.) Also, as stated above, the record shows that, in August and September 2002, attorney John Koopman performed services for H&W Associates and attorney Maury Reiter performed services for the Stranahan Charitable Trust. The Stranahans were desirous of controlling legal costs; moreover, their conduct shows an intent to compartmentalize the actions of all of their attorneys by giving separate, specific tasks to an attorney for specific entities without allowing any one attorney access to the "whole picture."

Because the record does not demonstrate that the Intervenors sought legal assistance from the Defendants, the Intervenors could not have a "reasonable belief" that the Defendants represented the Intervenors. Accordingly, the Defendants had no duty to protect the Intervenors' interests. *See Cost*, 677 A.2d at 1255 (Holding that wife could not have a "reasonable belief" that an attorney represented her in the buy-out of her husband's interests in various partnerships when the pleadings failed to allege that she sought legal assistance from the attorney; the court rejected the wife's argument that the attorney's status and demeanor created a duty either to protect her interests or to correct her misunderstanding and advise her to seek independent counsel.)

The Intervenors also argue that the Defendants owed them a duty as third party beneficiaries of the attorney/client relationship between the Defendants and the Debtor. Under

---

*Containment, Inc.)*, 335 B.R. 589, 603 (Bankr.E.D.Pa. 2005).

Pennsylvania law, however, a third party has standing to recover under a contract only when the
intention to benefit the third party is expressly set forth in the contractual language. *Williams
Controls, Inc. v. Parente, Randolph, Orlando, Carey & Associates*, 39 F.Supp.2d 517, 535
(M.D.Pa. 1999); *Guy v. Leiderbach*, 501 Pa. 47, 58, 459 A.2d 744, 750 (1983). Here, the
Intervenors are not designated as beneficiaries in the retention letter between the Debtor and
Defendants.[24]

For the reasons set forth above, I conclude that there was no express or implied
attorney/client relationship between the Intervenors and the Defendants, and the Intervenors were
not third party beneficiaries of the contract between the Debtor and the Defendants. Because
there is no basis for concluding that the Defendants owed a duty to the Intervenors, judgment will
be entered against the Intervenors and in favor of the Defendants on all counts in the Intervenors'
Amended Complaint.

(D)    Whether the Defendants' negligence was the cause of damages to the Debtor.

Even if the Defendants had breached a duty of care to the Debtor, to succeed, the Trustee
must also establish a causal connection between the Defendants' negligent conduct and the
Debtor's alleged damages. *McPeake v. Cannon*, 381 Pa.Super. 227, 232, 553 A.2d 439, 441
(Pa.Super. 1989). The Trustee argues that the Defendants' negligence in failing to investigate the

---

[24]The Pennsylvania Supreme Court has recognized a limited exception to the rule that the
creation of third-party contract rights must be clearly set forth in an agreement by adopting §302 of the
Restatement (Second) of Contracts and allowing recovery by third party *intended* beneficiaries.
*Williams Controls*, 39 F.Supp.2d at 535. To recover under the exception, a two-part test must be
satisfied: (1) the recognition of the beneficiary's right must be "appropriate to effectuate the intention of
the parties," and (2) the performance must "satisfy an obligation of the promisee [client] to pay money to
the beneficiary" or "the circumstances indicate that the promisee intends to give the beneficiary the
benefit of the promised performance." *Williams Controls*, 39 F.Supp.2d at 535 *quoting Scarpitti v.
Weborg*, 530 Pa. 366, 371, 609 A.2d 147 (1992). The contract between the Debtor and Defendants fails
to meet these requirements.

19

status of Fleet's filing of a UCC-1 financing statement was the factual cause and a substantial

contributing factor in the Debtor's inability to successfully reorganize its financial affairs, either

outside of or within a chapter 11 bankruptcy case. The Superior Court of Pennsylvania,

reviewing a legal malpractice case, defined "proximate" or "legal" cause as "[t]hat which, in a

natural and continuous sequence, unbroken by any sufficient intervening cause produces injury,

and without which the result would not have occurred."[25] *Id.*

    As the Court acknowledged during trial, whether a $5.8 million dollar creditor is secured

or unsecured can make a dramatic difference in the dynamics of negotiating a workout or in a

chapter 11 proceeding. But while an attorney's failure to research the status of a supposedly-

secured creditor *could* result in a foreseeable disadvantage to a client that is attempting to

---

    [25]Other courts have provided further guidance in evaluating "causation" under Pennsylvania law.
One District Court, construing Pennsylvania law, explained that a plaintiff must prove both "cause in
fact" (that the alleged injury would not have occurred but for the negligent conduct of the defendant) and
"proximate cause" (which "assumes the presence of cause in fact and serves as a means by which courts
are able to place practical limits on liability as a matter of policy.") *Galullo v. Federal Express Corp.*,
937 F.Supp. 392, 394-95 (E.D.Pa. 1996)(citations omitted).  Determining whether "cause in fact" has
been shown involves "a *de minimus* standard of causation under which even the most remote and
insignificant force may be considered the cause of an occurrence." *Id.* In determining "proximate cause"
(also known as "legal cause"), Pennsylvania has adopted the "substantial factor" test set forth in §431 of
the Restatement (Second) of Torts (1965). *Id.* "Under this test, a defendant's negligent conduct is not
the proximate cause of plaintiff's injury unless 'the alleged wrongful acts were a substantial factor in
bringing about the plaintiff's harm." *Id.* Section 432 of the Restatement further explains the "substantial
factor" test by stating: "the actor's negligent conduct is not a substantial factor in bringing about harm to
another if the harm would have been sustained even if the actor had not been negligent." *Jeter v. Owens-
Corning Fiberglas Corp.*, 716 A.2d 633, 637 (Pa.Super. 1998) *quoting* the Restatement (Second) of
Torts §432(1) (1965). The record in this case does not provide a basis for finding either cause in fact or
proximate cause.
    The proposed final draft of the Restatement (Third) of Torts: Liability for Physical Harm (2005)
revises the Restatement (Second)'s sections on "cause" and replaces them with chapters on "factual
cause" and "scope of liability." The revised section on "factual cause," which applies to cases regarding
physical harm, provides that "[c]onduct is a factual cause of harm when the harm would not have
occurred absent the conduct." Restatement (Third) of Torts: Liab. Physical Harm, §26 (2005). Although
not directly applicable here, there would be no "factual cause" here under the new Restatement, since I
conclude that any harm suffered by Penn Gear would have occurred even absent any breach of duty by
the Defendants.

reorganize its financial affairs, it need not be the cause of the client's financial collapse. Here,

there were so many intervening causes contributing to Penn Gear's demise, I cannot conclude

that, had the Defendants performed the UCC-1 search, the Debtor would have reorganized its

affairs (either in or out of bankruptcy) and the chapter 7 liquidation would not have occurred.

First, I cannot conclude that if the Debtor had known of Fleet's failure to file a UCC-1

financing statement, the Debtor would have been successful in entering into a loan workout

agreement with Fleet without filing a bankruptcy petition. Fleet already knew its secured status

was precarious and that its leverage was not strong while negotiating with the Debtor in August

2002.[26] (Ex. P-180 at 36.) Yet, at the August 21, 2002 meeting, Fleet made it clear to the

Debtor that it needed full disclosure of its finances before Fleet would consent to negotiate a

workout. (Tr. 5/5/05 at 92-93.) Fleet also wanted the Debtor to hire a turnaround consultant.

(*Id.*) To lay the groundwork for a workout, it is generally necessary that a borrower cooperate by,

*inter alia*, furnishing current, accurate information to the lender and taking steps necessary to

identify and correct financial and operational problems. (*See* Tr. 8/12/05 at 187-88). Here, Fleet

asked that the Debtor allow an audit and hire turnaround consultants. The Debtor, however,

refused to cooperate with Fleet's field examiner and failed to provide him with complete access

to its books and records. (Ex. P-180 at 129-131; Ex. P-2 at 2.) Moreover, although the Debtor

---

[26]The Trustee asserts that Fleet would have been less demanding in workout negotiations if the Debtor had known about Fleet's failure to perfect its secured claim. However, the record reflects that Fleet had placed its previous transactional counsel on notice of a potential legal malpractice claim for failing to file the necessary UCC-1 financing statements. (Ex. P-180 at 29-30.) With knowledge that it had a possible remedy against transactional counsel, Fleet would not be under such pressure that it would necessarily "cave in" to the Debtor's demands. In fact, Fleet may have had greater incentive to ensure that it was acting in a reasonable manner to mitigate its potential damages prior to pursuing a legal malpractice claim against its transactional counsel.

21

advised Fleet in September that it had hired a turnaround consultant, Fleet later determined this

to be untrue. (Ex. P-180 at 147-150.) There is also evidence that the Debtor would refuse to

include a release of claims against Fleet as part of any forbearance or workout agreement,

although such a provision is typically included. (Tr. 5/13/05 at 63-64; Tr. 8/11/05 at 35.)  The

Debtor was uncooperative throughout its dealings with Fleet and it is unlikely that the Debtor

would have been *more* cooperative if it felt it had greater leverage in negotiating with Fleet.

Rather, the opposite would have been more likely.[27]

        The record is clear that Fleet was distrustful of the Debtor's management.  In an internal

document prepared on or about September 26, 2002, describing the status of the loan, Fleet wrote:

> Field examiners uncovered a $400M overadvance at the end of July, and despite the
> advance notice of the visit, the company was not forthcoming with information.  They
> wouldn't answer many legitimate questions, refused to provide any information earlier
> than 2001, denied us access to their former auditors, and declined to address anything that
> occurred prior to 2002 under the defense that either it was already provided or it wasn't
> Fleet's business because the loan didn't close until 12/21/02.  This defensive behavior
> continues, and at least initially, management hinted at potential lender liability, but the
> claim appears to be without merit.

In the same document, describing risks associated with the Debtor's loan, Fleet wrote:

> *Management (High).*  Despite concerted efforts to encourage open communication
> and cooperation, [Fleet] has been unable to establish a productive working relationship
> with management.  The contact with management, while limited, has increased Fleet's
> concerns about management's ability and financial acumen as the team appears
> inexperienced and does not understand the dire situation the company is in.
> *Financial Integrity (High).*  Based upon the number of surprises in the FY'01
> audited [reports] from what was revealed during due diligence..., certain inaccuracies
> within the audit (incorrect line of credit maturity date and inability to reconcile the
> accounts receivable general ledger balance to the aging), questionable results at 6/30/02
> ($1MM of depreciation for the six months and the disposal of $3MM of PP&E that does
> not appear to be reflected in the net book value of the assets), Fleet has little confidence in

---

[27]Indeed, in light of the absence of personal guarantees to Fleet, I could easily infer that the
Stranahans' relationship with Fleet could have become even more strident.

the financial integrity of the results put forth by management.

(Ex. P-2 at 3.)

The record contains other allegations that Debtor's management had a history of

misrepresenting information to Fleet and others. For example, exhibits show that the Debtor

prepared two versions of financial statements for the first nine months of 2001. One, provided to

Fleet, showed a profit of $181,000. (Ex. D-23.) The second, provided to its prior lender, PNC

Bank, covering the same period, showed a loss of $258,000. (Ex. D-28). In his testimony at the

motion to convert the case, Fleet's auditor testified that the Debtor had submitted inflated

borrowing base certificates to Fleet.[28] (Tr. 12/11/02 at 138-39.)

The Trustee has not proven that the Debtor could have actually performed a workout

agreement with Fleet. Neither is there evidence of an amount that Fleet would have accepted as a

discounted settlement in a workout deal nor evidence that the Debtor could obtain funds to

refinance the debt. The record reflects that the Debtor's search for financing at terms acceptable

to the Debtor's management was unsuccessful.

In short, there is no evidence that the Debtor's lack of knowledge regarding Fleet's failure

to perfect its security interest was a "substantial factor" in its failure to obtain a successful pre-

bankruptcy workout agreement. Instead, management's refusal to cooperate with Fleet, Fleet's

distrust and lack of confidence in management, the Debtor's poor financial condition and inability

to obtain financing prevented the parties from reaching the point at which a workout agreement

could even be considered.

---

[28]The auditor testified that, based upon his review, the Debtor had engaged in a "bill and hold"
scheme, which means that the borrower invoices a customer for a product that is stored at the facility and
never shipped. This increased the Debtor's receivables by $105,000. (Tr. 12/11/02 at 138-39).

Second, I cannot conclude that the Debtor would have obtained confirmation of a chapter

11 reorganization plan if it had known of Fleet's lack of perfection and filed bankruptcy in time to

avoid Fleet's secured claim.  The Trustee argues that the Debtor could have filed a chapter 11 case

sooner, avoided Fleet's security interest under sections 544, 547 and 550 of the Bankruptcy Code,

and then proposed and confirmed a chapter 11 plan.  However, the evidence here shows that it

was unlikely that the Debtor, under its current management, could have remained in chapter 11 (as

a debtor in possession) or obtained confirmation of a chapter 11 plan.

Even assuming the Debtor could avoid Fleet's liens on its assets, Fleet would have held

the largest unsecured claim against the estate and certainly would have been an active participant

in the bankruptcy case.  Alisa Callahan testified that Fleet would not have voted in favor a plan

that allowed the Debtor's management to remain in control.  (Ex. P-181 at 242, 256-57.)  With or

without a chapter 11 trustee, the Debtor could not confirm a plan over Fleet's objection.  To

achieve confirmation of a plan under Bankruptcy Code §1129, a class of claims that is impaired

under the plan must vote to accept the plan.  11 U.S.C. §1129(a)(8).  Pursuant to Bankruptcy Code

§1126:

> A class of claims has accepted a plan if such plan has been accepted by
> creditors, other than any entity designated under subsection (e) of this section
> [i.e., an entity whose vote was not in good faith], that hold at least two-thirds in
> amount and more than one-half in number of the allowed claims of such class
> held by creditors ... that have accepted or rejected such plan.

11 U.S.C. §1126(c).  The Debtor's Bankruptcy Schedules listed unsecured nonpriority claims in

the amount of $2,102,964.25.  (Ex. P-150.)  The Schedules also list Fleet's claim in the amount of

$5,817,508.00.  (Ex. P-150.)  If Fleet's claim was unsecured, it would hold more than two-thirds

in amount of the total unsecured claims and, therefore, its vote against the plan would block

24

confirmation.

The Trustee's argument that the Fleet debt could have been separately classified and "crammed down" fails for three reasons.  First, separately classifying the Fleet unsecured debt from other unsecured debt would run afoul of the Bankruptcy Code's requirement that the plan must not "discriminate unfairly." 11 U.S.C. §1129(b)(1).[29]  Second, even if the Fleet debt could be separately classified, it could not be "crammed down" unless its treatment of Fleet's claim was "fair and equitable." 11 U.S.C. §1129(b)(1). The Bankruptcy Code provides that, to be fair and equitable with respect to an unsecured claim, a plan must overcome the absolute priority rule, which prohibits shareholders from retaining their ownership interests when more senior claims object. 11 U.S.C. §1129(b)(2)(B)(ii).[30]  Third, there was no credible evidence presented from which I could conclude that the equity owners either could or would try to avail themselves of the new value corollary to the absolute priority rule by contributing new value (usually money or money's worth) as a condition of retaining their ownership in the Debtor.[31]

Finally, in light of the evidence adduced at the December 11, 2002 hearing, this Court was unwilling to permit the bankruptcy to continue without the participation of an independent fiduciary.[32]  The evidence showed that the Debtor had engaged in a series of transfers to insiders

---

[29] See *In re Exide Technologies, Inc.*, 303 BR 48, 78 (Bankr.D.Del. 2003) citing *In re Genesis Health Ventures, Inc.*, 266 BR 591, 611 (Bankr.D.Del. 2001)("The hallmarks of the various tests [regarding unfair discrimination] have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination.")

[30] See *In re Armstrong World Industries, Inc.*, 432 F.3d 507 (3d Cir. 2005).

[31] See *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999).

[32] The basis for this decision was further supported by the trial record.  The hearing on December 11, 2002 was held to consider the Debtor's motion for dismissal of the chapter 11 bankruptcy case and

25

before and after August 2002 (when Fleet filed its UCC-1 financing statements). In July and

September, 2002, the Debtor assigned all of the proceeds it received from certain military

contracts (totaling in excess of $9 million) to H&W Associates, in exchange for H&W Associates

providing $300,000 working capital. (Tr. 12/11/02 at 32-36; Ex. P-104; Ex. P-107;

Ex. P-108; Ex. P-122.[33]) In September, 2002, the Debtor granted security interests to H&W

Associates and Stranahan Charitable Trust to secure debts owed to those entities.[34] (Exs. P-111,

P-113, P-114, P-120, and P-121.) The Debtor also made monthly payments to Henry Stranahan

and William Stranahan, which stopped in approximately July 2002. (Tr. 12/11/02 at 48-51, 122-

23.) Whether any effort to avoid the insider transfers ultimately would be successful, the estate

needed and the creditors deserved an independent fiduciary - - whether in the form of a chapter 11

or a chapter 7 trustee - - to review and, if necessary, pursue such actions for the benefit of

creditors. This record raises substantial doubt about management's ability (or willingness) to

protect the interests of non-insider creditors and propose a plan in good faith. *See* 11 U.S.C.

§1129(a)(3). Neither is there any evidence upon which I could conclude that management would

have cooperated with a chapter 11 trustee to achieve confirmation of a plan.

    I cannot conclude, on this record, that the demise of the Debtor could have been averted

---

Fleet's motion for conversion of the case to chapter 7. The record of the December 11, 2002 hearing has
been incorporated into the trial record. (Ex. D-168.)

   [33]Exhibits P-104, P-107 and P-108 document the Debtor's assignment of the proceeds of certain
military contracts to H&W Associates. Exhibit P-122 shows that the value of all of the Debtor's military
contracts exceeded $12 million, and the contracts referenced as assigned to H&W Associates in the
above-cited exhibits exceeded over $9 million of that total.

   [34]There was testimony at the hearing on December 11, 2002 by Fleet's auditor that the $325,000
given to the Debtor by Stranahan Charitable Trust was not a loan, but was reflected in the Debtor's year
end records for 2001 as paid in capital. (Tr. 12/11/02 at 140-41.)

had the Debtor known that Fleet did not file UCC-1 financing statements until August 2002.

Therefore, any breach by the Defendants could not be the cause in fact or proximate cause of the

Debtor's failure to reorganize in chapter 11.

II.     Breach of Contract.

Count II of the Trustee's Complaint seeks recovery for the same damages as discussed

above under the theory that the Defendants breached their employment contract with the Debtor.

A court should review the terms of the contract to determine whether an attorney has breached the

attorney-client agreement. *Fiorentino*, 693 A.2d at 213.  Pennsylvania courts have determined

that "an attorney who agrees for a fee to represent a client is by implication agreeing to provide

that client with professional services consistent with those expected of the profession at large."

*Fiorentino*, 693 A.2d at 213 *quoting Bailey v. Tucker,* 533 Pa. 237, 251-52, 621 A.2d 108, 115

(1993).  The courts have also noted that damages for claims in assumpsit based upon the breach of

an attorney/client agreement are "limited to the amount actually paid for the services provided

plus statutory interest." *Green v. Altman,* 2004 WL 2106552, *7  (E.D.Pa. 2004) *quoting Bailey*,

621 A.2d at 252.

To recover under a breach of contract theory, the Trustee must prove that the Debtor

suffered an actual loss as a result of the breach of contract. *Green,* 2004 WL 2106552 at *6.  If

the damages are too remote, speculative or unidentifiable, a plaintiff will not be able to recover.

*Id.*  For all the reasons set forth above regarding lack of causation, the damages suffered by the

Debtor were too remote from any alleged breach to support recovery.  Even if the Defendants' had

breached their retention agreement with the Debtor, the link between that breach and any damages

suffered by the Debtor is too attenuated to allow recovery here.  The Trustee's claims for breach

27

of contract will be denied.[35]

      An appropriate order will be entered.

BY THE COURT:

_____

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  June 26, 2006

---

[35]The third count in the Trustee's complaint asserts not an additional claim, but an alternative
theory of damages (liquidation value damages) if the Trustee was successful under either the negligence
or breach of contract claims.  Because I have concluded that the Trustee is not entitled to recover under
either claim, I need not consider the third count.

## UNITED STATES BANKRUPTCY COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| · In re | : | CHAPTER 7 |
| | : | |
| **PENNSYLVANIA GEAR** | : | |
| **CORPORATION,** | : | *ELF* |
| | : | Bankruptcy No. 02-36436 ~~KJC~~ |
| Debtor | : | |

| | | |
|---|---|---|
| **CHRISTINE C. SHUBERT,** | : | |
| Chapter 7 Trustee, | : | |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| **ADELMAN LAVINE GOLD & LEVIN,** | : | |
| **P.C., and GARY SCHILDHORN,** | : | |
| | : | |
| Defendants | : | Adversary No. 04-0096 KJC |
| | : | |
| **HENRY STRANAHAN, STRANAHAN** | : | |
| **FAMILY BUSINESS PARTNERSHIP,** | : | |
| **L.P., H&W ASSOCIATES, and** | : | |
| **STRANAHAN CHARITABLE TRUST** | : | |
| Intervenors | : | |
| | : | |

### ORDER

**AND NOW**, this 26th day of June, 2006, after a trial on the merits and for the reasons set

forth in the foregoing Memorandum, it is hereby **ORDERED** and **DECREED** that:

(1)    with respect to the Second Amended Complaint filed by the Trustee in this

proceeding, judgment is entered IN FAVOR of the DEFENDANTS and AGAINST

the TRUSTEE on all claims; and

(2)    with respect to the Amended Complaint filed by the Intervenors in this proceeding,

judgment is entered IN FAVOR of the DEFENDANTS and AGAINST the

INTERVENORS on all claims.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

2

Copies mailed to:

Alan L. Frank, Esquire
Frank, Rosen, Snyder &Moss, LLP
8380 Old York Road, Suite 410
Elkins Park, PA 19027

Arthur W. Lefco, Esquire
Marshall Dennehey Warner Coleman & Goggi
1845 Walnut Street, 17th Floor
Philadelphia, PA 19103

Paul R. Beckert, Jr., Esquire
Law Offices of Paul R. Beckert, Jr.
203 Corporate Drive East
Bensalem, PA 19020

Frederic J. Baker, Sr., Esquire
Senior Assistant United States Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107

Chief Judge Diane W. Sigmund
Judge Bruce I. Fox
Judge Stephen Raslavich
Judge Eric L. Frank
Judge Richard E. Fehling

Timothy B. McGrath, Clerk, U. S. Bankruptcy Court
Pamela Blalock, Courtroom Deputy Clerk